43 A.3d 648 (2012)
305 Conn. 82
STATE of Connecticut
v.
Francisco PASCUAL.
No. 18589.
Supreme Court of Connecticut.
Argued February 1, 2012.
Decided June 5, 2012.
*649 Adele V. Patterson, senior assistant public defender, for the appellant (defendant).
Timothy J. Sugrue, assistant state's attorney, with whom, on the brief, was Kevin D. Lawlor, state's attorney, for the appellee (state).
ROGERS, C.J., and PALMER, ZARELLA, McLACHLAN, EVELEIGH, HARPER and VERTEFEUILLE, Js.
ZARELLA, J.
The defendant, Francisco Pascual, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-70 (a)(1) and 53a-49 (a)(2), attempt to commit sexual assault in the first degree in violation of §§ 53a-70 (a)(2) and 53a-49 (a)(2), kidnapping in the first degree in violation of General Statutes § 53a-92 (a)(2)(A), kidnapping in the first degree in violation of § 53a-92 (a)(2)(B), risk of injury to a child in violation of General Statutes § 53-21(a)(2), risk of injury to a child in violation of § 53-21(a)(1), and unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a). On appeal, the defendant claims that the trial court improperly (1) admitted hearsay evidence that, several days before the charged events, the victim[1] was told about a threat made by an unidentified third party, and (2) instructed the jury that the threat evidence was admitted to show that the victim reasonably feared the defendant in *650 order to prove the sexual assault and kidnapping charges. The state responds that the trial court properly admitted the evidence and properly instructed the jury. We conclude that, even if the trial court improperly admitted the evidence and gave improper instructions to the jury, the defendant is not entitled to a new trial because the purported improprieties were not harmful. Accordingly, we affirm the judgment of the trial court.
The jury reasonably could have found the following facts. On December 24, 2007, the victim, a twelve year old girl from El Salvador, was brought to a "safe house" in Los Angeles, California, after illegally crossing the border from Mexico into the United States with a group of ten other people. The victim's illegal entry into this country had been paid for by her mother, who was living in Boston, Massachusetts, and intending to pick up the victim in Rhode Island on December 29, 2007. While the victim was at the safe house, another girl who had been there for several weeks informed the victim that she had been told by an unidentified third party that anyone who failed to pay for his or her illegal crossing would be taken to the desert and shot. Although the victim's mother had fully paid for the victim's crossing,[2] the victim felt "afraid" when she heard about this threat.
The defendant subsequently picked up the victim at the safe house in his minivan (van) and spent the next several days driving her and nine other illegal immigrants to New York City, arriving after midnight on December 29. All but the victim and one other passenger were dropped off at that time. Although the victim told the defendant that she also wanted to be dropped off in New York City, the defendant refused when the victim asked to use one of his cell phones to request her mother's permission, telling her that he would call her mother as soon as they got to Rhode Island. The victim thus stayed in the van with the defendant because she did not have her mother's telephone number and believed that she had no other choice.
The defendant later dropped off the other remaining passenger and continued driving. After a while, the defendant said that he wanted to get some sleep and that he was going to stop at a motel. The victim told the defendant that he should drop her off first and then get some sleep. During this exchange, the defendant kept trying to touch the victim's legs and breasts, and she kept pushing his hand away.
The defendant eventually stopped at the Hampton Inn in the city of Milford. After the defendant parked the van, he got out without saying anything to the victim, locked her inside and walked into the motel. Around that time, he also called the victim's mother, telling her that he would drop off the victim in Rhode Island at approximately 11 a.m. and would call her when he was nearby. Something about the call made the victim's mother nervous, and she immediately called her brother-in-law, with whom she started driving to Rhode Island.
Meanwhile, the victim, who was now alone in the van, noticed that the defendant had left behind his cell phones, but, by the time she thought of grabbing one and making a call to her mother, she saw the defendant returning to the van and did not follow through. At that point, she also tried to get out of the van but discovered that the doors were locked. When the defendant returned to the van, he seized *651 the victim by her arm and brought her into the motel.
Once inside the motel room, the defendant gave the victim a toothbrush and toothpaste and ordered her to brush her teeth. The victim also took a shower but was afraid to come out of the bathroom. After she finally came out, the defendant went into the bathroom. The victim took this opportunity to try and leave but was unable to do so because there were several locks on the door and she did not know how to unlock them. She then sat down on a chair and started to write her mother a note, telling her that she loved her and that she thought something might happen to her.
While she was still writing, the defendant emerged from the bathroom naked, approached her and threw her on the bed. The victim struggled to defend herself as the defendant tried to unzip and pull down her pants. During the struggle, the defendant used one hand to cover the victim's mouth and the other to touch her vagina. He also touched her breasts and legs with his penis. As the victim continued to struggle, the defendant struck her on the side of her face. The victim could not recall exactly what happened next, except that she got out of the defendant's reach, grabbed his jacket, managed to unlock and open the door, and started running from the motel room.
The defendant's jacket contained two cell phones, one of which the victim used to call her mother. Her mother advised the victim, who was crying, to seek help at a nearby store or gas station. The victim did not try to locate a police officer because she feared deportation. She finally found a store adjacent to a gas station, and the proprietor called the police.
The victim did not tell the police immediately about everything that had happened because of her illegal status and her fear of deportation. Eventually, however, she gave a complete account of the incident, and the defendant was arrested after she identified him as her assailant. The defendant, who was twenty-five years old at the time, ultimately was charged with two counts of sexual assault in the first degree, two counts of kidnapping in the first degree, two counts of risk of injury to a child, and one count of unlawful restraint in the first degree.
On August 31, 2009, approximately one month before the start of the trial, the state filed a request to introduce evidence of uncharged misconduct. The state indicated that it wanted to introduce evidence that (1) the defendant illegally transported the victim from the United States border with Mexico to Milford, (2) the victim's mother paid the defendant $12,000 for her illegal entry into the United States and subsequent transportation across the country, (3) the victim was told that if the money was not paid, she would be brought back into the desert and killed, (4) the victim was transported in the defendant's van with ten other persons who were all dropped off in New York City, and (5) the defendant and the victim were alone in the van from New York City to Milford, where the sexual assault occurred. The state claimed that the foregoing evidence was relevant as proof of the means and opportunity for the defendant to commit the crimes with which he was charged and as proof of a "system of criminal activity which culminated in the crimes charged...." The state also claimed that the probative value of the evidence outweighed its prejudicial effect.
Following defense counsel's objection on grounds of relevancy, factual accuracy and prejudicial effect, the state filed an amended proffer of evidence on September 25, 2009. In the amended proffer, the state sought to admit only a single statement *652 under the state of mind exception to the hearsay rule. Specifically, the state sought to introduce testimony that "the victim was informed in California that, if the defendant's human trafficking operation was not paid for its services, she would be taken to the desert and killed." The state emphasized that the testimony would not be offered to show that the defendant had threatened the victim but "to show the apprehension of danger and fear instilled in the victim. This fear will account for the reasonableness of the victim's actions as it relates to the charge of kidnapping." (Emphasis in original.) The state further explained, with respect to the kidnapping charges, that it would be required to prove that the victim reasonably believed that force would be used if she tried to escape and lack of apparent consent, and that introduction of the statement would bear directly on the material issue of why the victim did not flee from the defendant. Defense counsel again objected on the ground that the statement's probative value was outweighed by its prejudicial effect. He also objected on the ground that the statement had no bearing on the victim's fear of the defendant. Defense counsel further noted that the victim had not indicated who had made the threat, and, therefore, the state was suggesting a remote and speculative connection in claiming that the victim made no attempt to escape while being transported to her mother because another unidentified individual had threatened to kill her if the agreed upon fee had not been paid.
On September 28, 2009, the court held a hearing but did not rule on the motion. The state's attorney (prosecutor) argued that the statement was admissible because it showed why the victim feared the defendant. Defense counsel responded that the statement should be excluded because it was inadmissible hearsay and had no relevance. It was not until trial, just prior to the victim's testimony, that the court issued a brief oral ruling allowing admission of the statement and overruling defense counsel's objections. Thereafter, the prosecutor asked the victim in the presence of the jury: "[W]hen you were staying at [the safe] house, do you remember hearing anyone in the house state anything to you about what would happen if the money that your mother was to pay wasn't paid? Do you recall anyone saying anything about what would happen if that money wasn't paid?" Defense counsel objected on hearsay grounds, and the court immediately cautioned the jury: "There's a hearsay objection that the testimony will be about what someone else said, and that someone is not here [and] subject to cross-examination. This testimony is being offered for a limited purpose and not to prove the matter asserted within the question. No, it's only for a limited purpose, and you'll hear that purpose after the answer to this question. The objection is overruled." The victim then responded in the affirmative to the prosecutor's question and subsequently added: "There was a girl there who ha[d] been there for about a month. She was telling us that they told her that they were [going to] take them to the desert and leave them there and shoot them." The court again instructed the jury: "Now, that testimony is not being offered to prove any of thator the state's not alleging that's true at all. It's not being offered for the truth of the matter asserted within that statement, only as it relates to her mind, her state of mind, as [it] relates to the evidence that you will be hearing. That's the only use that you will use, that her state of mind only, nothing else." The prosecutor next asked the victim how she had felt upon hearing the threat, and the victim responded: "I was afraid."
*653 During his initial summation, the prosecutor argued that the defendant had abducted and restrained the victim by locking her in the van while he checked into the motel, by grabbing her arm and taking her into the motel, and by locking her in the motel room. The prosecutor also argued that the defendant had committed the assault by placing and holding the victim on the bed, unzipping her pants and hitting her in the face. He made no reference to the victim's testimony regarding what she had heard in the safe house with respect to the dire consequences of failing to pay for an illegal entry into the United States.
Defense counsel argued that the jury should find that there was reasonable doubt, based on the lack of corroborating evidence, that the victim had suffered any physical injury or trauma, and that the victim lacked credibility. Defense counsel also argued that the victim had participated voluntarily in the trip across the country, had consented to ride in the van and had paid for the trip. He further declared: "There's no evidence ... of any abuse [in the van].... There's no evidence of any clubs. There's no evidence of any knives." Rather, he suggested that the victim had accompanied the defendant into the motel room voluntarily because she wanted to shower and that, after her shower, she could have walked out of the motel room and left the defendant if she had wanted to do so.
In his rebuttal, the prosecutor replied: "When [defense] counsel makes mention of the fact that ... there were no bats or knives or anything used here, what was one of the first things you heard [the victim] talk about? It was when she was in [Los Angeles] at the house where she gets picked up by this guy. What does she hear being said? You don't pay that money, you don't pay that second payment, you get brought out in the desert and killed. What do you think is going through her mind as she's driving across the country, in that van, for fifty-five hours, with the guy in front saying, no sleep? You're not allowed to sleep. She's twelve, doesn't speak the language. What's going through her mind? Do you think she reasonably believes ... does she reasonably believe, under those circumstances, that this man was going to allow her to leave? That's what's in her mind, prior to pulling into that parking lot." The prosecutor then added: "When she pulled into that parking lot, what was the evidence again? That she was locked in that car. [Defense] [c]ounsel says there's nothing strange about those locks. She's twelve years old. She's from [El Salvador]. Is that what you reasonably expect this person to be able to do? No, I would suggest not." The prosecutor then went on to discuss other aspects of the evidence in his lengthy rebuttal argument.
Upon completion of closing arguments, the court charged the jury in relevant part: "In this matter, the court allowed evidence, testimonial evidence by the [victim], regarding fear. This type of testimony is limited ... for you to determine her state of mind. This type of testimony, which is not normally allowed, was allowed under these circumstances for a limited purpose only. It was not allowed certainly to prove the truth of it but merely to show what [the victim's] state of mind was at the time as it related to the reasonableness of her fear of physical injury being imposed upon her if she did not comply. Limited purpose."
The court later instructed the jury on the charged crimes. With respect to the crime of forcible sexual assault in the first degree, the court instructed the jury in relevant part: "If you find that the [victim] consented to the act of sexual intercourse, *654 you cannot find that the act was compelled. Such consent must have been actual and not simply acquiescence brought about by force, by fear or by shock." The court also instructed that a threatened use of force might be "implied from the circumstances" but that it "must have been such that it reasonably caused the [victim] to fear physical injury to herself." With respect to the crimes of kidnapping in the first degree, the court instructed that the defendant need not use actual force, "he need only to threaten to use force in such a manner that the [victim] reasonably believed that force would be used if she tried to escape." The court further explained that the victim's consent "must have been actual and not simply acquiescence brought about by force, fear, shock or deception."
The jury found the defendant not guilty of the two sexual assault charges but guilty of both counts of attempt to commit sexual assault in the first degree. The defendant also was found guilty as charged on the two counts of first degree kidnapping, two counts of risk of injury to a child, and one count of unlawful restraint in the first degree. Thereafter, the court sentenced the defendant to fifteen years imprisonment and ten years of special parole. This appeal followed.
The defendant claims that the trial court improperly admitted the threat evidence under the state of mind exception to the hearsay rule because (1) the threat constituted hearsay, (2) the evidence had no relevance because there was no basis, other than sheer speculation, for connecting the threat to the defendant such that it would cause the victim to fear him and prevent her from fleeing in Milford, and (3) the hearsay statement contains an additional level of hearsay for which there is no exception, namely, conveyance of the threat to the victim by the girl who had heard it from the unidentified source at the safe house. The defendant further claims that the improper admission of this evidence was harmful because the trial court instructed the jury that the victim's testimony regarding the threat could be used to determine her state of mind as it related to the reasonableness of her fear of physical injury if she did not comply with the defendant's demands, which, he claims, is an essential element of the forcible sexual assault count; see General Statutes § 53a-70 (a)(1);[3] the offense of attempt to commit first degree sexual assault; see General Statutes §§ 53a-70 (a)(1) and 53a-49 (a)(2);[4] and the two first degree kidnapping charges. See General Statutes § 53a-92 (a)(2)(A) and (B). We conclude that, even if the trial court improperly *655 admitted the threat evidence, the impropriety was not harmful.[5]
The defendant concedes that any potential error was not of constitutional magnitude. "[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) State v. Sawyer, 279 Conn. 331, 357, 904 A.2d 101 (2006), overruled in part on other grounds by State v. DeJesus, 288 Conn. 418, 953 A.2d 45 (2008). "[W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.... Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) Id., at 358, 904 A.2d 101. The defendant has the burden of showing that admission of the evidence was harmful. See, e.g., id. In the present case, the most important factors are the overall strength of the prosecution's case and the impact of the evidence and the jury instructions on the trier of fact.
With respect to the sexual assault charge; see footnote 3 of this opinion; the jury found the defendant not guilty, and, therefore, any possible impropriety with respect to the admission of the threat evidence was necessarily harmless in relation to that charge. As to the defendant's conviction of attempt to commit first degree sexual assault, the trial court instructed the jury in accordance with the criminal attempt statute, General Statutes § 53a-49, which provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he ... (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Thus, to the extent that the jury was required to consider state of mind as an element of the crime, it was required to consider the defendant's state of mind and not the victim's. In other words, there is no element in the criminal attempt statute that required the state to prove that the victim consented to entering and remaining in the motel with the defendant or that she reasonably feared physical injury. Accordingly, the trial court did not instruct the jury to consider the victim's state of mind in deciding whether the defendant was guilty of attempt to commit first degree sexual assault because such an instruction would have been improper, and we may presume that the jury did not consider the threat evidence under the state of mind exception to the hearsay rule in deciding the defendant's guilt under the criminal attempt statute. Cf. Hurley v. Heart Physicians, P.C., 298 Conn. 371, 403, 3 A.3d 892 (2010) ("[i]n accordance with our jurisprudence and the lack of evidence to the contrary, we presume that the jury followed the trial court's charging instructions"); Gajewski v. Pavelo, 229 Conn. 829, 837, 643 A.2d 1276 (1994) ("[i]t is presumed that the jury follows the instructions given *656 by the court"). We therefore conclude that any potential impropriety relating to the admissibility of the threat evidence was harmless with respect to the defendant's conviction of attempt to commit first degree sexual assault under §§ 53a-70 (a)(1) and 53a-49 (a)(2).
With respect to the two kidnapping charges and convictions, General Statutes § 53a-92 (a) provides in relevant part that "[a] person is guilty of kidnapping in the first degree when he abducts another person and ... (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony...." Under General Statutes § 53a-91 (2), the term "abduct," as used in the foregoing kidnapping statutes, means "to restrain[6] a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." The trial court thus instructed that a finding of abduction by means of holding the victim in a place where she was not likely to be found did not require evidence of the use or threatened use of force but that an abduction by use or threatened use of force did require evidence that the defendant either used or threatened to use force in such a manner that the victim reasonably believed that force would be used if she tried to escape.[7]
The defendant argues that the trial court's instructions impermissibly allowed the jury to infer that the victim reasonably believed that she was under a constant threat of being shot and left in the desert to die to prove the first essential element of the kidnapping charges. Even assuming the threat evidence should not have been admitted, however, we conclude that its admission was harmless because of the *657 overall strength of the state's case and the impact of the evidence and the limiting instructions on the trier of fact.
We first note that the effect of the threat on the victim's perception of the defendant when the kidnapping occurred would have been difficult for the jurors to assess without her direct testimony on that issue. The victim heard about the threat several days before the kidnapping, it was not attributed to the defendant, and it did not directly implicate the victim, who testified that her mother had paid the fee for her illegal entry and never indicated that she had harbored any fears that the fee had not been paid. Although the victim stated that she felt "afraid" upon hearing the threat, she did not testify that the threat caused her to fear the defendant while being transported in the van or that she thought about the threat during the subsequent kidnapping. Moreover, there was other, very strong evidence that the defendant abducted the victim by using or threatening to use physical force or intimidation to prevent her from leaving him after they reached New York City.
There is no question that, before the van arrived in New York City, the victim was traveling with the defendant voluntarily. Her family had arranged and paid for her to be transported by the defendant from the safe house in Los Angeles to Rhode Island, and she had assented to the journey by getting into the van and failing to leave or express reservations about continuing the journey when the defendant made bathroom or gasoline stops along the way. After the van arrived in New York City, however, the undisputed facts establish that the defendant prevented the victim on numerous occasions from acting on her clear desire to leave and that she reasonably believed that he would forcibly restrain her if she made such an attempt.
The defendant initially refused the victim's request to use his cell phone so that she could ask her mother's permission to be picked up in New York City instead of in Rhode Island. Lacking any other way to contact her mother, the victim testified that she got back into the van because she did not know her mother's telephone number and believed that she had no other choice.
Thereafter, when the defendant and the victim were alone in the van, he refused the victim's request to deliver her to her mother in Rhode Island before stopping at the motel. Because the victim could not disembark while the van was moving, she was forced to accompany the defendant as he drove to the motel. Moreover, she reasonably could have known that stopping at the motel was a pretext for something other than sleeping because they were close to their Rhode Island destination, and the defendant had said that he wished to stop at the motel while making unwanted sexual advances.
After the defendant arrived at the motel, he locked the victim in the van and went inside to register. Although the victim thought about grabbing the defendant's cell phone to call her mother and attempted to exit the van, she was prevented from accomplishing either goal when she saw the defendant returning and could not unlock the doors. This testimony was especially indicative of the victim's fear of the defendant because it implied that the only reason she did not attempt to call her mother was because of how the defendant might react if he caught her in possession of the cell phone.
The defendant then applied direct physical force to prevent the victim from leaving by seizing her arm and bringing her into the motel. After that, he locked her in the motel room, where her initial attempts to escape when the defendant was in the *658 bathroom were thwarted by her inability to unfasten the locks. At this crucial point, when the victim felt completely trapped, she expressed her fear of the defendant and sense of impending harm in the letter to her mother, in which she said that she loved her and indicated that something bad might happen. When the defendant emerged from the bathroom, he again used force to detain the victim by throwing her on the bed and carrying out the assault, thus revealing his motive for the kidnapping. The victim's final expression of her continuing fear and defiance was her escape from the defendant after he started the assault by freeing herself from his grasp, unlocking the motel room door, running from the room with the defendant's jacket containing the cell phones and using one of the cell phones in order to call her mother and tell her what had happened.
These facts, which the jury reasonably could have found, demonstrate that the defendant not only used direct physical force but repeatedly engaged in other conduct intended to intimidate the victim and prevent her from leaving, starting in New York City and continuing until her flight from the motel room in Milford. The victim's mother corroborated the fact that the victim felt threatened by testifying that she became nervous after receiving the cell phone call from the defendant during which he told her that he was going to drop the victim off in Rhode Island a few hours later. The mother also testified that the victim was crying when she called to tell her what had happened.
In addition to this evidence, the jurors were presented with evidence that the victim stood in such a vastly inferior position to the defendant that, regardless of any overt threat, she would have been intimidated and forced to comply with his demands. She was a twelve year old girl who did not speak English and was traveling in a foreign country that she had entered as an illegal alien. She thus was subject to deportation if she was discovered, a fact that prevented her from looking for a police officer immediately following the assault. The defendant, in contrast, was a twenty-five year old man of superior strength who had been paid to transport the victim several thousand miles and deliver her to her mother. Accordingly, the disparity in age, gender and physical strength, and the business transaction that required the defendant to transport the victim to her mother, would have caused the victim reasonably to believe that the defendant would take whatever measures he deemed necessary, including force, to prevent her from fleeing.
Moreover, the state's case against the defendant with respect to the kidnapping charges was so strong that, in his initial summation, the prosecutor did not refer to the threat evidence in contending that the kidnapping charges had been proven beyond a reasonable doubt. The prosecutor instead argued that the victim was forced to comply with the defendant's demands for the reasons described previously. It was only after defense counsel contended during closing arguments that the defendant had not used "bats" or "knives" to force the victim's compliance that the prosecutor argued in rebuttal that the threat she heard about in the safe house had contributed to her belief that the defendant would not allow her to leave. Furthermore, the prosecutor did not emphasize the threat in his rebuttal argument but referred to it only briefly in responding to defense counsel's summation. During his rebuttal argument, the prosecutor also discussed the effect of other evidence regarding the victim's fear of the defendant, such as the locked doors in the van and the motel room, and the defendant's unwillingness to drop her off in New *659 York City or to drive her to Rhode Island without stopping at the motel. Finally, the trial court instructed the jury that the threat evidence was not being admitted for its truth but merely to show the victim's state of mind, as it related to the reasonableness of her fear of physical injury if she did not comply with the defendant's demands. Accordingly, because the state's case was very strong, even without the threat evidence, that evidence would have had little if any effect on the jury's finding, with respect to the kidnapping charges, that the victim reasonably believed that force would be used if she tried to escape from the defendant. We therefore conclude that the defendant has failed to satisfy his burden of showing that any impropriety was harmful because it cannot be said, with fair assurance, that the error substantially affected the verdict.
The judgment is affirmed.
In this opinion the other justices concurred.
NOTES
[1] In accordance with our policy of protecting the privacy interests of victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.
[2] Testimony established that the victim's mother paid approximately $5500 to have the victim transported from El Salvador to Rhode Island.
[3] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person...."
[4] The defendant at times refers to first degree sexual assault, the crime with which he was charged, and at other times to attempted first degree sexual assault, the crime of which he was convicted. We thus consider harmless error with respect to both crimes. We also note that the defendant asserts this claim only with respect to the forcible sexual assault count; see footnote 3 of this opinion; because the other sexual assault count contains no element that would require consideration of the victim's state of mind. See General Statutes § 53a-70 (a)(2) ("[a] person is guilty of sexual assault in the first degree when such person . . . engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person").
[5] We thus do not address the state's contention, which was discussed extensively by the parties during oral argument, that the defendant's double hearsay claim is unreviewable because it was not properly preserved.
[6] General Statutes § 53a-91(1) provides in relevant part: "`Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein `without consent' means, but is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old ... and the parent, guardian or other person ... having lawful control or custody of him has not acquiesced in the movement or confinement."
[7] Although there is no element in the kidnapping statutes that explicitly requires proof of the victim's state of mind, this court has stated that evidence that is "probative of the victim's state of mind may be admissible ... when that state of mind is independently relevant to other material issues in the case." State v. Blades, 225 Conn. 609, 634, 626 A.2d 273 (1993). Thus, when a defendant, as in the present case, is charged with first degree kidnapping and the jury is instructed on the meaning of "abduct," which requires a finding that the defendant restrained the victim "with intent to prevent his liberation by . . . using or threatening to use physical force or intimidation"; General Statutes § 53a-91 (2); the trial court may allow the jury to consider evidence that the victim reasonably believed that force would be used if he or she tried to escape as proof that the defendant intended to prevent the victim's liberation by threats or intimidation. See, e.g., State v. Wideman, 36 Conn.App. 190, 196, 650 A.2d 571 (1994) (explaining, where defendant was charged with kidnapping and sexual assault, that "[t]he state of mind of the victim is a relevant consideration in both of these crimes. The statutes focus on the mental state of the victim when the crimes are accomplished by the `threat of force.' The evidence produced at trial showed that the kidnapping was a result, in part, of the fear that the victim had of the assailants and that this fear caused her to be intimidated into going to building thirteen with them. Therefore, the [evidence], which revealed [the victim's] fear of the defendant, was relevant to the kidnapping and sexual assault counts."), cert. denied, 232 Conn. 903, 653 A.2d 192 (1995).